UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Brian Woodburn

    v.                                      Civil No. 06-cv-260-PB

Commissioner, NH Dept.
of Corrections, et al.

### REPORT AND RECOMMENDATION

Pro se prisoner Brian Woodburn ("Woodburn") filed a complaint pursuant to 42 U.S.C. § 1983, claiming several of his constitutional rights were violated when the New Hampshire State Prison ("NHSP") transferred him to Rhode Island in September 2005, due to his pattern of aggressive institutional behavior and resulting need for protection.  Ordinarily, before any action is taken on a pro se complaint, it is subject to preliminary review to determine, among other things, whether a claim for relief has been stated.  See 28 U.S.C. § 1915A; see also U.S. District Court for the District of New Hampshire Local Rule 4.3(d)(2).  In this case, however, Woodburn moved for preliminary injunctive relief (doc. no. 11), seeking an immediate transfer back to the NHSP to prevent the alleged irreparable harm his continued placement there would cause.  A hearing was held on October 19, 2006, to

determine whether the preliminary injunction should issue. After carefully considering the claims and evidence presented, I recommend Woodburn's motion for a preliminary injunction be denied and his complaint be dismissed.

## Analysis

1. Standard of Review

Preliminary injunctive relief is available to protect the moving party from irreparable harm, so that he may obtain a meaningful resolution of the dispute after full adjudication of the matter. Such a situation arises when some harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F,3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate); see also Acierno v. New Castle County, 40 F.3d 645, 653 (3rd Cir. 1994) (explaining irreparable harm and its effect on the contours of preliminary injunctive relief)[1].

---

[1]"Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Acierno,40 F.3d at 653.

Absent irreparable harm, there is no need for a preliminary injunction.

The need to prevent irreparable harm, however, exists only to enable the court to render a meaningful disposition on the underlying dispute.  See CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc., 48 F.3d 618, 620-1 (1st Cir. 1995)(explaining the purpose of enjoining certain conduct as being to "preserve the 'status quo' . . . to permit the court more effectively to remedy discerned wrongs"); see also Becton v. Thomas, 48 F. Supp. 2d 747, 753 (W.D. Tenn. 1999) ("'The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" (quoting Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir. 1978)).  The court's focus, therefore, must always be on the underlying merits of the case, and what needs to be done to ensure that the dispute can be meaningfully resolved.

A preliminary injunction cannot issue unless the moving party satisfies four factors which establish its need for such relief.  See Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zavas, 445 F.3d 13, 17-18 (1st Cir. 2006) (discussing the requisite showing to obtain a preliminary injunction); see also

Ross-Simons of Warwick, Inc., 102 F.3d at 18-19 (explaining the burden of proof for a preliminary injunction).  Those factors are:  "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Esso Standard Oil Co., 445 F.3d at 18.  If the plaintiff is not able to show a likelihood of success on the merits, the remaining factors "become matters of idle curiosity," id., insufficient to carry the weight of this extraordinary relief on their own. See id. (the "sine qua non of the four-part inquiry is likelihood of success on the merits").  Yet, "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem."  Ross-Simons of Warwick, Inc., 102 F.3d at 19.

Since Woodburn must demonstrate his likelihood of success on the merits, the preliminary issue of whether he has stated a claim upon which relief may be granted arises.  Under this Court's local rules, when an incarcerated plaintiff commences an

action pro se and in forma pauperis, as Woodburn did, the magistrate judge is directed to conduct a preliminary review and to prepare a report and recommendation determining whether the complaint or any portion thereof should be dismissed because:

> (i) the allegation of poverty is untrue, the action is frivolous, malicious, or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief under 28 U.S.C. § 1915A(b); or
>
> (ii) it fails to establish subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

LR 4.3(d)(2). In conducting the preliminary review, the Court construes pro se pleadings liberally. See Ayala Serrano v. Lebron Gonzales, 909 F.2d 8, 15 (1st Cir. 1990) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976) to construe pro se pleadings liberally in favor of the pro se party). "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled." Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997), cert. denied, Ahmed v. Greenwood, 522 U.S. 1148 (1998). Additionally, all plaintiff's factual assertions and inferences reasonably drawn therefrom must be accepted as true. See Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996) (stating the "failure to state a claim"

standard of review and explaining that all "well-pleaded factual averments," not bald assertions, must be accepted as true). This ensures that *pro se* pleadings are given fair and meaningful consideration. See Eveland v. Dir. of C.I.A., 843 F.2d 46, 49 (1st Cir. 1988).

### 2. Background

The salient background facts are undisputed. Woodburn is a self-avowed white supremacist, who has a lengthy record of disciplinary reports stemming from his aggressive behavior while incarcerated. He was transferred from the New Hampshire Department of Corrections' Northern Correctional Facility in Berlin, New Hampshire to the NHSP because of his difficult behavior and resultant need for increased security status within the prison. Woodburn's pattern of obstreperous, malicious behavior continued at the NHSP. In late November 2003, he instigated, but lost, a fight with another inmate, Ramon Guerrero, who is a member of the Latino gang "Latin Gangsta Disciples" ("LGD" also known as "G"). On December 2, 2003, Woodburn retaliated by dowsing Guerrero with a boiling liquid that caused Guerrero to be hospitalized for more than a week to

treat second and third degree burns.[2]  Woodburn then became the target of threats by Latino gangs within the prison, specifically the "Gs," which prison staff believed were credible.  In December 2003, therefore, for disciplinary and protective reasons, Woodburn was moved into the Secure Housing Unit ("SHU"), where he remained, with one brief respite in January 2005, until his transfer to Rhode Island in September 2005.  The transfer was made because NHSP officials had determined Woodburn could not be housed safely at their facility and believed he would benefit from a "fresh start" in a new place.

The parties dispute the degree of protection Woodburn needed at NHSP.  Woodburn requested several times to sign a "waiver" that would enable him to be transferred to the less secure "Close Custody Unit."  He argued gang members should have been moved into SHU rather than he, and submitted multiple requests for review of his custody status, particularly compared to that of LGD members.  Woodburn contends his transfer to Rhode Island was retaliatory, in response to his filing a suit against the prison, and that the purported protection concerns were only a pretext.

---

[2]Woodburn denies ever fighting with Guerrero; however, there was credible evidence proffered at the hearing to substantiate this version of the two incidents.  By contrast, and as explained further on in this opinion, I found Woodburn not to be credible.

Woodburn now asserts that the transfer has caused him irreparable harm, because his status as a "protective custody" inmate has stigmatized him as either a rat or a bully, neither of which are identities received well by an inmate population. Woodburn alleges he has been verbally abused and physically threatened by other inmates in Rhode Island, but that he has not reported the problems to avoid placement in protective housing again. Since being transferred, Woodburn has been held in two other locations, including punitive segregation for fighting with another inmate, before his current placement in the High Security Center in Cranston, Rhode Island ("HSC-RI"), where he has been since April 2006. Woodburn claims that since he has been in Rhode Island, his life has been threatened, specifically that the Rhode Island Associate Director of Classifications, A.T. Wall ("Wall") requested inmates to kill him. According to Woodburn, his protection issues are in Rhode Island, not New Hampshire.

Based on these allegations, Woodburn is seeking an immediate transfer back to New Hampshire and is seeking relief under 42 U.S.C. § 1983. Liberally construing his complaint[3] as I am

---

[3] Woodburn filed both an original complaint (doc. no. 1) and an amended complaint (doc. no. 6), which are being considered jointly as his complaint in this preliminary review.

required to do at this stage of review, Woodburn asserts the following claims: (1) by placing him in SHU and refusing to investigate his requests to be moved to a lower custody status, defendants have inflicted cruel and unusual punishment and deprived him of procedural due process, in violation of his Eighth and Fourteenth Amendment rights; (2) by transferring him to Rhode Island in retaliation for his pursuing legal action, defendants have denied his right to access the courts in violation of the First, Sixth and Fourteenth Amendments; and (3) by refusing to transfer him back to New Hampshire after being informed that his life was in jeopardy at HSC-RI, defendants have inflicted cruel and unusual punishment in violation of his Eighth rights.  Woodburn alleges that he exhausted his available administrative remedies before bringing this action.

3. Discussion

My facial review of Woodburn's complaint indicates he has asserted facts which, if accepted as true and very generously construed, may support at least some of the asserted § 1983 claims.  This action's fatal problem, however, is that Woodburn requested injunctive relief, which resulted in an evidentiary hearing being held on the matter.  Now, rather than mere

allegations, there is proffered evidence before the court which must be considered and which very clearly vitiates the claims asserted. See Fed. R. Civ. P. 65(a)(2) (allowing court to consider the evidence pertaining to the merits as if it were admitted at trial); see also Fed. R. Civ. P. 12(b)(6) (disposing of a complaint under preliminary review for failure to state a claim on summary judgment grounds where matters outside the pleading are accepted).

Woodburn testified at the hearing on his own behalf. His direct testimony contradicted the allegations of harm being inflicted on him by the Rhode Island prison system and failed to demonstrate in any way how his continued placement in HSC-RI would irreparably harm him. He did not cite a single condition of his confinement that he wanted changed. He did not introduce one exhibit which documented in any way his claim of abusive verbal and physical treatment, either to substantiate his contention that Director Wall wanted him killed or that he was being mistreated by other inmates because of his status as a protective custody transferee and a white supremacist. When I asked him specifically to identify any problems he was having at HSC-RI, Woodburn did not offer a single example. Instead, he

simply repeated his request to be transferred back to New Hampshire because he was unhappy about how other inmates might treat him as a protective custody inmate.

By contrast, the state proffered substantial evidence that disproved Woodburn's claims. First, the record contains no less than 23 disciplinary and incident reports (with another 28 summarily listed) obtained during his New Hampshire incarceration, <u>see</u> Exhibits B-H and J, beginning as early as 2001 and continuing through his transfer to Rhode Island in September 2005, that document a clear pattern of aggressive, disrespectful and unruly behavior by Woodburn. These reports establish a solid foundation for Woodburn's placement in SHU, regardless of any protection issues the NHSP may have been addressing. <u>See</u> Exhibits H and I (record of hearing held before Woodburn's assignment to SHU). The record also shows that Woodburn's custody status was regularly reviewed. <u>See</u> Exhibits A, I, K, M and O. This evidence directly opposes Woodburn's claim that his placement in SHU was so wanton and egregious that it violated his Eighth Amendment right to be free from cruel and unusual punishment, <u>see</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)(requiring obduracy and wantonness, not good faith

mistakes, before conduct is prohibited by the Eighth Amendment), see also Skinner v. Cunningham, 430 F.3d 483, 488 (1st Cir. 2005) (finding injuries caused during cell removal were neither maliciously nor deliberately inflicted to give rise to an Eighth Amendment claim); or his claim that it was an unjustified restraint imposed without a hearing or other administrative review, in violation of his Fourteenth Amendment due process rights.  See Sandin v. Conner, 515 U.S. 472, 484 (1995) (limiting liberty interests protected by procedural due process to freedom from those restraints which impose "atypcial and significant hardship on the inmate in relation to the ordinary incidents of prison life"); see also Skinner, 430 F.3d at 487 (applying Sandin to find no hardship in prisoner isolation and, therefore, no due process violation).

 Second, nothing in the record supports Woodburn's claim that his transfer was in retaliation for his filing of a lawsuit rather than for his protection.  There is no record of any legal action commenced by Woodburn until he initiated the instant action, nearly ten months after he was transferred.  The record supports the state's position that the LGD threats to Woodburn's personal safety were serious.  See Exhibits G, L and N.  Three

12

witnesses testified about the Guerrero altercation, and the record shows that both the prison as well as Woodburn in fact believed there was a risk of Woodburn being killed if he left SHU.  See Exhibit N at 2.[4]  One witness explained the size and power of the gang, which bolstered the claimed concern about Woodburn's personal safety in the general population.  Another witness responded to Woodburn's question about segregating the gang rather than him, by testifying that until an incident occurs, the NHSP generally does not change the custody status or placement of inmates.  The evidence consistently corroborated the state's position that Woodburn's record of disciplinary problems and security threats were the bases for transferring him out of the NHSP.  Such justifications for the transfer are legitimate penological goals that do not rise the level of a due process or any other constitutional violation.  See Sandin, 515 U.S. at 485 (discussing how the restricted liberty interests of prisoners is necessary to effectuate the goals of prison management and prisoner rehabilitation).

---

[4]Woodburn dismissed this report, claiming his concerns about his safety were actually sarcastic.  Because so much of the record undermines Woodburn's current representations about his treatment at NHSP, I find the contemporaneous record of his feelings more persuasive than his recent rendition of the events.

Finally, there was clear and convincing evidence that Woodburn fabricated Director Wall's alleged efforts to have him killed, which was the basis for both the preliminary injunction and his third claim that the NHSP's failure to transfer him back, in light of that threat, constitutes cruel and unusual punishment.  See Exhibits Q, T and U.  This evidence shows that Woodburn was frustrated that Director Wall would not transfer him back to NHSP and, therefore, concluded he must want Woodburn killed.  See id.  Woodburn admitted he falsely accused Wall and that he had no concrete evidence to support his suspicion that his life was in jeopardy.  The record demonstrates that Woodburn has continued his racially motivated malfeasance at HSC-RI, but that he presents no protection or disciplinary issues requiring transfer out of state.  See Exhibit Q.

The evidence against Woodburn was substantial.  Woodburn has a documented pattern of antisocial, malicious behavior.  His transfer to Rhode Island has not caused him any demonstrable irreparable harm nor given rise to any constitutional violations.  The record does indicate, however, that since December 2003, Woodburn has spent the majority of his prison time in SHU, with all its attendant deprivations.  While the general point that

inmates in need of protective custody should not be penalized by being placed in SHU is reasonable, in this case, that placement appears to be legitimate under the facts and circumstances presented here.  Accordingly, after careful consideration of the full record before me, I find no evidence to support the relief sought in the instant matter.

## Conclusion

Since Woodburn failed to demonstrate any risk of irreparable harm or any likelihood of success on the merits of his claims, I recommend that his motion for preliminary injunctive relief be denied.  I further recommend that his complaint be dismissed for failure to state a claim upon which relief may be granted.  See 28 U.S.C. § 1915A(b); see also LR 4.3(d)(2).

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See 28 U.S.C. § 636(b)(1); see also Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d

11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

　　　　　　　　　　　　　　　　　／s／ James R. Muirhead
　　　　　　　　　　　　　　　　　James R. Muirhead
　　　　　　　　　　　　　　　　　United States Magistrate Judge

Date:   November 2, 2006

cc:     Nancy Smith, Esq.
        Brian Woodburn, pro se